IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.: 7:23-cv-4

| | | |
|---|---|---|
| JACINTO GOMEZ OVANDO and MARIA DEL CARMEN PERALTA BAEZA, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| *Plaintiffs,* | ) ) | **PLAINTIFFS' COLLECTIVE AND CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| MOUNTAIRE FARMS, INC. and MOUNTAIRE FARMS OF NORTH CAROLINA, CORP., | ) ) ) | |
| | ) | |
| *Defendants.* | ) ) ) | |

COMES NOW, Jacinto Gomez Ovando ("Named Plaintiff" or "Gomez"), Maria Del Carmen Peralta Baez ("Named Plaintiff" or "Peralta Baeza") on behalf of themselves and all others similarly situated, by and through undersigned counsel, and hereby sets forth this collective action for violation of the Fair Labor Standards Act under § 216(b), and a representative action under the North Carolina Wage and Hour Act pursuant to Fed. R. Civ. P. 23, and alleges as follows:

**PRELIMINARY STATEMENT**

1.      Named Plaintiffs, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), bring this action against Mountaire Farms, Incorporated and Mountaire Farms of North Carolina, Corp. ("Mountaire" or "Defendants") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq*., for unpaid overtime compensation, unpaid wages, and related penalties and damages, as well as under N.C. Gen. Stat. N.C. Gen. Stat. § 95-25.8(a)(2), *et seq.*, for wages unlawfully deducted by Defendants.

2. Plaintiffs consist of current and former employees working at Defendants' chicken processing plant.

3. Despite notifying Plaintiffs of their non-exempt hourly status, entitlement to premium rates for certain hours worked, including premium pay for hours over forty per week, promised hourly rates, through an employee handbook and earning statements consistent with the NCWHA's notice requirements, Plaintiffs, and others similarly situated, were not always paid for all of their hours worked, including time spent working through lunch breaks, donning and doffing personal protective equipment prior to the start of their shift and following the end of their shift, and either were not paid for all of their hours worked, or did not receive overtime premium at time and one-half for certain hours worked over 40 per week, and/or, did not receive the appropriate premium overtime rate because Defendants did not incorporate all gross earnings in determining the appropriate regular-rate for overtime compensation when Plaintiff worked in excess of forty (40) hour workweeks, in violation of the FLSA or the NCWHA, as applicable.

4. Defendants are aware of Plaintiffs working generally in excess of forty (40) hours per week, as Defendants have suffered or permitted, and in fact, required Plaintiffs to work in excess of forty (40) hours per week on a regular basis without being properly compensated time and one-half (1.5) for hours over 40 per week.

5. Defendants are also aware that Plaintiffs engage in additional uncompensated time worked due to the integral nature of the work which requires Plaintiffs to don personal protective equipment ("PPE") to avoid cross-contamination, prior to the start of their shift and before they clock in, in addition to, the end of their shift, but clocking out prior to doffing all PPE, to ensure all hours worked are accurately recorded. Moreover, Plaintiffs are required to work through their scheduled lunch breaks given the integral nature of the doffing and donning of PPE and repeated

handwashing to avoid any contamination of food borne pathogens or cross contamination of the same; thus, such responsibilities require an extensive number of minutes to remove all PPE and wash off the chicken, blood, and guts, both prior to taking their lunch break, but also upon their return from their lunch break, requiring them to return early. Nevertheless, Defendants automatically deduct thirty-six (36) minutes for lunch breaks irrespective of whether employees work through a substantial portion of such lunch breaks.

6.      Defendants' practice of failing to compensate Plaintiffs at the appropriate promised straight time and overtime rates and failure to compensate Plaintiffs for all compensable work violates Plaintiffs' rights under the NCWHA and statutory required overtime pursuant to the FLSA.

7.      In addition, Defendants' practice of unlawfully deducting the cost of required PPE from Plaintiffs' wages without ensuring the proper written authorization has been obtained by Plaintiffs, identifying such deductions as "plant supplies" and/or "chicken sales" when such sales are actually for the cost of required PPE. Such deductions violate N.C. Gen. Stat. §§ 95-25.6, 95-25.7, 95-25.8(a)(2), 95-25.13, and 13 NCAC 12. 0305(g).

8.      Defendants' pay practices and policies are in direct violation of the FLSA's statutory required overtime; and therefore Plaintiffs, on behalf of themselves, and all others similarly situated, seek statutory overtime wages and the appropriate overtime premiums for all overtime work required, suffered, or permitted by Defendants, liquidated damages and/or other damages as permitted by applicable law; attorneys' fees, costs, and expenses incurred in this action.

9.      Plaintiffs bring this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class:

3

All individuals who were, are, or will be employed at Defendants Mountaire's North Carolina facilities as employees on the chicken processing line who were not compensated for all of their hours worked, including, but not limited, above forty (40) per week any time within three years prior to the commencement of this action, through the present.

10.    Defendants are liable for their failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

11.    Plaintiffs who elect to participate in this FLSA collective action seek compensation for all work performed for Defendants, regardless of whether the work was performed outside scheduled shift times, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, post-judgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

12.    Plaintiffs also bring this action, on their own behalf of themselves, and as representatives of similarly situated current, former, or future employees, employed by Defendants at Mountaire's chicken processing facilities in North Carolina, under the NCWHA.

13.    Plaintiffs, who are  North Carolina residents and who worked for Defendants in North Carolina, assert that they and the putative class, members who work or worked in North Carolina for Defendants, are entitled to compensation for all work performed for Defendants, whether the work week totaled greater or fewer than forty (40) hours, compensation at the appropriate regular or promised rate for hours worked less than 40 per week, and/or the promised and/or appropriate premium rate for all hours worked in excess of forty (40) per week, especially during workweeks when shift differentials applied but were not included as part of the regular earnings for determining the appropriate, promised premium rate(s), and for an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d). These promises are not enforceable under

4

the FLSA, and thus the NCWHA is much more stringent and provides greater protections to North Carolinians than the FLSA.

14.     Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in North Carolina:

> Individuals who were, are, or will be employed at Mountaire's North Carolina chicken processing facilities on the chicken processing line, and were not compensated all promised, earned, and accrued wages due to Defendants' policies, including, but not limited to, compensation for all hours worked up to forty (40) in a week and for hours worked above forty (40) in a week within two years prior to the commencement of this action, through the present and whose deductions for personal protective equipment were made without any advance written notice of the intent to make such wage deduction in the manner required by the NCWHA at any time since January 9, 2020 until the present.

15.     In addition, Named Plaintiff Gomez brings this action to remedy Defendants' unlawful acts upon Named Plaintiff Gomez for exercising his rights under the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240, for discriminating against Plaintiff Gomez following complaints regarding workplace safety and Defendants subsequently terminating Plaintiff Gomez, in violation of REDA and North Carolina public policy.

16.     Accordingly, Plaintiff Gomez seeks all available relief for these claims, including, but not limited to, back pay, front pay, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorney's fees, and costs, consequential damages, and all other relief permitted by applicable law.

## PARTIES

17.     Defendants are the fourth largest chicken processing company in the United States with locations in Arkansas, Delaware, Maryland, Virginia, and North Carolina, and has an annual revenue of over $2 billion.[1]

18.     Defendants are organized under Delaware law and have their principal place of business at 1901 Napa Valley Dr., Little Rock, Arkansas, 72212.

19.     Defendants operate a chicken processing plant in Lumber Bridge, NC, which employs over 1,000 workers.

20.     Plaintiff Gomez is an adult citizen and resident of the State of North Carolina, residing in Shannon, North Carolina. Named Plaintiff worked for Defendants as a killing line employee on the chicken processing line, where Named Plaintiff's primary duties included ensuring chickens were properly slaughtered.

21.     Plaintiff Gomez worked for Defendants in their Lumber Bridge, North Carolina, location as a non-exempt, hourly employee.  Plaintiff Gomez worked for Defendants from January 2011 until January 14, 2022.

22.     The FLSA collective and Putative Plaintiffs consist of individuals who have worked for Defendants, who were non-exempt employees paid an hourly wage, and who were not properly paid for hours worked and promised overtime hours worked, given Defendants' policy and practice of automatically deducting lunch breaks and requiring employees to don PPE  before clocking in at the start of their shifts and doff PPE  after clocking out at the end of Plaintiffs' shift rather than requiring Plaintiffs to clock out at the end of their shift and after all PPE has been doffed and sanitation requirements including handwashing has been performed.

---

[1] *See* https://mountaire.com/about-us/; *see also* https://www.forbes.com/companies/mountaire-farms/?sh=4dcb0f9561af.

23.     At all relevant times, Defendants have had gross operating revenues in excess of $500,000, consistent with 29 U.S.C. § 203(s)(1)(A)(ii).

24.     Plaintiffs bring this action on their own behalf and, pursuant to 29 U.S.C. § 216(b), as representatives of a proposed collective action of similarly situated employees.

## JURISDICTION AND VENUE

25.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 for the claims brought under the FLSA, 29 U.S.C. § 201, *et seq*.

26.     The United States District Court for the Eastern District of North Carolina has personal jurisdiction because Defendants conduct business in Robeson County, North Carolina, which is located within this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants conducted business within the Eastern District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

28.     The claims for violations of the NCWHA and REDA are based upon the statutory law of the State of North Carolina.

29.     Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA and REDA because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

30.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

31.     The evidence establishing liability for the causes of action will be similar, and the state law claims will not predominate nor create confusion for a jury.

32.     Upon information and belief, during the period relevant to this action, Defendants were an employer, joint employer, or member of an integrated, common enterprise, that employed Plaintiff, pursuant to REDA, in that Defendants, or its agents, held or implemented the power, *inter alia*, to control the work performance of Plaintiff, and Defendants directly received the benefit of Plaintiff's labor.

## COVERAGE

33.     At all times material to this action, Defendants have acted, directly or indirectly, in the interest of an employer or joint employer with respect to Named and Putative Plaintiffs.

34.     At all times material to this action, Defendants was an employer within the defined scope of the FLSA, 29 U.S.C. § 203(d).

35.     At all times material to this action, Named and Putative Plaintiffs were individual employees within the scope of the FLSA, 29 U.S.C. §§ 206 and 207.

36.     At all times material to this action, Defendants were an enterprise engaged in related activities performed through a unified operation or common control for a common business purpose, as defined by the FLSA, 29 U.S.C. § 203(r).

37.     At all times material to this action, Defendants were an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS[2]

38.     Mountaire is an agricultural food production and processing company with over 10,000 employees across the United States, serving markets in forty-six states in the United States and more than eighty countries globally. Mountaire processes approximately 8.5 million pounds of inedible chicken products weekly at their chicken processing facilities and operates feed mills and grain elevators. Defendants process chicken in North Carolina to be used for animal and aquaculture feeds and as organic fertilizers.[3]

39.     Upon information and belief, Defendants have more than 10,000 employees, including at locations in Arkansas, Delaware, Maryland, Virginia, and North Carolina.

40.     Defendants employ individuals on an assembly line referred to as a "chicken processing line." Employees are assigned tasks such as deboning, slaughtering, packaging the chicken, and/or operating forklifts.

41.     Regardless of which subsection of the chicken processing line Plaintiffs worked, Plaintiffs were generally responsible for facilitating the processing of chicken. Plaintiffs could and would be reassigned to various subsections of the processing line, including performing deboning, slaughtering, packaging, or operating forklifts, as needed, to ensure the seamless flow of poultry through the process.

## WAGE-RELATED FACTUAL ALLEGATIONS

42.     Defendants compensate employees working on the chicken processing line, such as Named Plaintiff, on an hourly basis. Defendants classify these employees as hourly non-exempt

---

[2] For ease of reference, Plaintiff has divided the factual allegations into identifiable sections using headings. However, such headings have no bearing on the substantive relevance of each fact as to any or all of Plaintiff's claims.

[3] *See* https://www.linkedin.com/company/mountaire-farms#:~:text=About%20us,80%20countries%20around%20the%20world; https://mountaire.com/about-us/sustainability/.

under the FLSA.

43.    On or about January 21, 2011, Plaintiff Gomez started working for Defendants as a temporary employee on the deboning line, which is a section of the chicken processing line. On January 21, 2019, Plaintiff Gomez transitioned to a permanent employee on the deboning line and eventually transferred to operating a forklift in March 2020. In November 2020, Plaintiff Gomez became a permanent employee of Defendants on the killing line, which is another section of the chicken processing line.

44.    Similarly, Plaintiff Peralta Baeza began working for Defendants in 2005 and ended her employment in July 2022.  During the majority of her employment, she worked as a Line Leader in deboning but also worked as a Line Leader in the PAWS department where they processed chicken legs and feet.  She worked in this department until the end of her employment with Mountaire.

**Plaintiffs' Personal Protective Equipment Requirements ("PPE"):**

45.    Plaintiffs working on any part of the chicken processing line are required to wear any of the following PPE items, (i.e., metal gloves, silk gloves, rubber gloves, cotton gloves, plastic sleeves, arm shield, knife sheath, knife, hairnet, beard net, ear plugs, glasses, plastic apron, lab coat, and hard hat) to protect themselves from the gruesome working conditions.

**Plaintiffs' Duties:**

46.    Since Plaintiff Gomez worked on the kill line, he was responsible for ensuring the chickens were dead before moving down the assembly line. When the machines failed, Plaintiff Gomez was tasked with physically gashing the chickens' throats with a sharp knife. For example, while working on the killing line, Plaintiff Gomez's duties included slaughtering chickens on a conveyor belt and ensuring that chickens were properly killed after they were electrocuted by a

machine. Plaintiff Gomez was responsible for manually slaughtering any chickens (by hand) that were not properly killed by the machine and was previously tasked with deboning the chicken and operating a forklift.

47.     When the machine functioned properly, the machine incapacitated the chickens using electrocution and then placed the chickens on a pully where their necks would be cut.

48.     On occasions where the chickens were *not* properly incapacitated, Plaintiff Gomez was required to cut the chickens' throats by hand using a sharp knife.

49.     Similarly, Named Plaintiff Peralta Baeza, was a line leader in the PAWs department.   The PAWS department processed chicken legs and feet.   Named Plaintiff Peralta was responsible for assisting employees on the processing line, filling in when employees were ill or at lunch. Additionally, where employees were not working or had issues with machines, Plaintiff Peralta Baeza might attempt to investigate the matter or require assistance for ensuring the machines were working properly before communicating any employee concerns with the Human Resources Department or other related departments.

**Pre-Shift Donning Requirements:**

50.      While Plaintiff Gomez's shift began at 2:30 pm, he was required to arrive at 2:20 pm.  Immediately upon arrival, he would obtain his gloves and hairnet, then he would walk past the cafeteria where he would obtain the lab coat, apron, and hard hat, and finally enter the locker room where he obtained any remaining items from his locker, including his glasses.  He was not allowed to punch in earlier than 2:26 pm.

51.     Similarly situated putative Plaintiffs and Rule 23 class members were also required to put on some PPE, (prior to clocking in),  walk to the cafeteria, before obtaining additional PPE, before heading into the locker room.

52.     Additionally, after putting on some of the PPE and prior to arriving at their workstation on the line, putative Plaintiffs and Rule 23 class members would clock in.

53.     Likewise, Named Plaintiff Peralta Baeza, was a line leader in the PAWs department.  While she was required to punch in no earlier than 3:00 pm, she would arrive at approximately 2:45 pm, to begin obtaining her PPE.  She was then responsible for providing employees in her department with some of their PPE, and while most were required to punch in no earlier than 3:10 pm, they would begin arriving at 3:00 pm., to begin acquiring some of their PPE before punching in.

54.     While his pay rate increased at various points in his employment with Defendants, Plaintiff Gomez's final pay rate was approximately $19.00 per hour.  Similarly, Plaintiff Peralta Baeza's final pay rate was approximately $ 17.00 per hour.

**Work Schedule, Lunch Breaks, and Average Hours Worked:**

55.     Plaintiff Gomez worked the second shift, which was scheduled from approximately 2:30 p.m. – 11:00 or 11:30 p.m. or as late as midnight.  In other words, there was no set end of shift time.  Similarly, Plaintiff Peralta Baeza also worked the second shift which was scheduled from approximately 3:05 p.m. to 11:45 p.m.  Both Plaintiffs worked from Monday through Friday, and sometimes Saturday, with a scheduled thirty-six-minute meal break.

**Lunch Breaks:**

56.     While Defendants scheduled thirty-six (36) minute unpaid lunch breaks each shift, Plaintiffs often worked through a substantial portion of their lunch break, continuing their required duties, including, but not limited, properly removing their PPE and thoroughly washing their hands to avoid any cross-contamination of the product, acquiring food borne pathogens, or cross-contamination while also ensuring employees' safety.  In other words, Plaintiffs were required to

comply with OSHA safety required standards prior to the start of their day, during lunch breaks, and after completing their work on the processing line and completing their doffing activities. As such, Plaintiffs' lunch breaks did not constitute a full, uninterrupted thirty-six minutes nor were they paid for all hours worked as communicated by Defendants that they would do so.

57.     Due to the nature of the work, Plaintiffs were required to remove or doff, wash, and sanitize their personal protective equipment and gear at the start of their thirty-six-minute lunch break and were also required to wash, sanitize, and don personal protective equipment and gear before returning from their lunch break.  On average, Plaintiffs lost anywhere between fifteen (15) and twenty (20) minutes for lunch.

58.     Plaintiffs were not required to clock out or back in for their lunch breaks. Irrespective of whether Plaintiffs took a meal break, Defendants automatically deducted a full thirty-six (36) minutes regardless of the actual time Plaintiffs spent engaged in their lunch break, and no matter how little time they spent on such lunch breaks.

59.     Therefore, Plaintiff's lunch breaks were typically between sixteen (16) and twenty-one (21) minutes and thus should not have been automatically deducted from their workday. Moreover, because Defendants had the capability to track each minute for Plaintiffs' lunch breaks through its Kronos time clock, including but not limited to, determining how much time Plaintiffs engaged in required working time during such lunch breaks, Defendants have no excuse for not compensating Plaintiffs accordingly.

60.     The actions described above are compensable work because the donning and doffing of protective and sanitary equipment and gear is required by Defendants, the United States Department of Agriculture, and the nature of the job, and as such, these activities are integral and indispensable to the chicken processing work the Plaintiffs perform.

**Post-Shift Donning Requirements:**

61.    At the end of each shift, Plaintiffs were required to clock out before doffing and sanitizing protective and sanitary equipment at the end of their shifts.

62.    Plaintiffs were also required to engage in these post-shift activities (such as doffing and washing off poultry remains) pursuant to Defendants' policy and practice, in addition to, OSHA food processing safety regulations, of requiring employees to sanitize their personal protective equipment and gear after clocking out at the end of their shifts. Removing and sanitizing equipment is an integral and indispensable part of chicken processing work and is related to the principal employment duties of the chicken processing employees.

63.    Because Plaintiffs were required to be at their designated workstation on the line at a certain time, they were required to arrive sufficiently early to acquire their PPE, prepare, and walk, prior to the start of their shift.

64.    Moreover, Plaintiffs were required to be fully dressed in all their proper equipment and gear at the chicken processing line within the first five minutes of the start of their shift, Plaintiffs were required to put on personal protective equipment and gear before clocking in to meet Defendants and OSHA mandated requirements. Defendants did not pay Plaintiffs for such time.

65.    Because Plaintiffs were required to doff protective gear and clean off any poultry parts and then required to re-don protective gear during their scheduled thirty-six (36) minutes meal break, Plaintiffs regularly performed necessary work duties during their meal break. Regardless of Plaintiffs performing this work, Defendants continued deducting a full thirty-six (36) minutes from each shift and did not pay Plaintiffs for such time.

66.    Because Plaintiffs were required to doff protective gear after clocking out, Plaintiffs

regularly performed post-shift activities off the clock. Defendants did not pay Plaintiffs for the necessary post-shift activities.

67.     Additionally, although Plaintiffs were promised to be compensated for all hours worked, because of Defendants' policies, practices, and mandated OSHA requirements, each Plaintiff lost approximately thirty (30) minutes when combining the required pre/post-shift donning, doffing, in addition to, donning/doffing during lunch breaks. As such, Named Plaintiffs, Putative Plaintiffs and Rule 23 class members lost a minimum of 2.5 hours per week which, at time and one-half, amounts to approximately $71.25 per week or a minimum of $3,705.00 annually.

68.     As a result, Defendants have failed to properly compensate Plaintiffs for all of their hours worked, and as such, they have unpaid wages due.

**Unauthorized Deductions for PPE:**

69.     Additionally, on one or more weekly pay period(s) in the three-year time period preceding the filing of this Complaint, Defendants made wage deductions from the weekly wages due to each of the Named Plaintiffs, Putative Plaintiffs, and the members of the proposed Rule 23 class for "Plant Supplies" without providing any advance written notice of the intent to make such wage deductions to the Named Plaintiffs and putative plaintiffs in the form required by the NCWHA. Such "plant" or "chicken" sale items were nothing more than Defendants passing on the charge to Plaintiffs for required PPE which Defendants should have provided at no charge to Plaintiffs, Putative Plaintiffs and Rule 23 class members.

70.     As such, the deductions taken were not in compliance with the NCWHA.

71.     Defendants were subject to a class action, filed on October 2, 2009, in the case

*Romero v. Mountaire Farms of North Carolina, Corp.*, No. 7:09-CV-190-BO (E.D.N.C. 2009),[4] which involved FLSA and NCWHA allegations related to Defendants' failure to compensate employees for time spent donning and doffing personal protective equipment, in addition to unauthorized deductions. In *Romero*, the parties agreed to a settlement of almost eight million dollars to compensate Plaintiffs, which was ultimately approved by the court. *See* Judgement No. 7:09-CV-190-BO, Page 1 (Aug. 2013). Similarly, Defendants were sued in *Perez v. Mountaire Farms, Inc.*, 610 F. Supp. 2d 499 (D. Md. 2009), *affirmed in part, vacated in part*, 650 F.3d 350 (4th Cir. 2011) another lawsuit for similar claims of unpaid hours worked due to uncompensated donning/doffing time. The lawsuit in Maryland settled for approximately $65,000,000. *See* Order No. 1:06-cv-00121-BEL, Pages 1-9 (July 2009). Despite changes made following such a lawsuit, including but not limited to, adding more time clocks and providing easier access to PPE, Defendants do not permit Plaintiffs to clock in immediately before acquiring and donning the first piece of personal protective equipment or allowing Plaintiffs the opportunity to remove, wash, and sanitize before clocking out at the end of their shift. More importantly, Defendants do not allow Plaintiffs to clock out before leaving for lunch or clock back in prior to re-donning personal protective equipment, to ensure they are being compensated properly for all of their hours worked.

72.     Indeed, despite the *Romero* and *Perez* litigations, Defendants have continued to carry out unlawful pay practices, as alleged herein.

73.     Defendants' failure to compensate for all properly recorded hours worked, including all work performed from the time Plaintiffs clocked in through the time Plaintiffs clocked out, and to pay employees all promised, earned, and accrued wages has affected all Putative Plaintiffs similarly.

---

[4] Plaintiffs' Counsel Hernandez was class counsel in *Romero*. *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 718 (E.D.N.C. 2011).

74.     As stated above, each Named Plaintiff lost a minimum of 2.5 hours per week which, at time and one-half amounts to approximately $71.25 per week or $3,705.00 annually which Plaintiffs are entitled to in lost wages.

**RETALIATION AND WRONGFUL TERMINATION FACTUAL ALLEGATIONS**

75.     Named Plaintiff Gomez worked for Defendants at Defendants' facility located in Lumber Bridge, NC.

76.     Plaintiff Gomez received approximately one month of training by Mountaire on the Occupational Safety and Health Administration of the United States Department of Labor (hereinafter "OSHA") and animal cruelty laws when he started on the killing line in 2020.

77.     According to the relevant animal cruelty laws, for the ethical treatment of birds, less than 1% of birds should be slaughtered manually.

78.     As part of the chicken processing process, the machine was intended to first electrocute the birds to the point of paralysis and then place the chickens on a pully where they would consequently have their throats sliced.

79.     The machine processed approximately 25,000 birds per day, of which the applicable OSHA requirements would allow for up to two-hundred fifty (250) birds per hour to be slaughtered manually.

80.     On average, Plaintiff Gomez was required to manually slaughter seventy (70) birds per hour, which equates to about 2% of the total birds slaughtered, even when the machine functioned normally.

81.     However, in January 2021, Plaintiff Gomez noticed the machine used to slaughter the birds had serious malfunctioning issues, wherein the machine did not properly incapacitate the birds, thus preventing the birds from being humanely killed. When the machine failed to kill the birds, Plaintiff Gomez was required to stop the processing line and slaughter the poultry by hand.

82.     Plaintiff Gomez's machine on the slaughtering line malfunctioned on average three to five times per week. When the machine malfunctioned, Plaintiff Gomez was required to slaughter anywhere from 300 to 500 birds per hour, about 16% of the overall number of birds slaughtered. On days when the machine malfunctioned, the manual slaughtering of poultry was extremely messy, as Plaintiff Gomez was charged with slashing the conscious chickens' throats with a blade. As a result, Plaintiff Gomez and his workstation would be covered in gallons of blood, guts, and other poultry parts.

83.     Manually slaughtering 16% of chickens violated applicable animal cruelty laws and OSHA requirements, particularly because the excess manual slaughtering of poultry was extremely messy and resulted in excess blood and guts in the workplace, which, even with protective gear, created an unsafe, unsanitary work environment.

84.     Plaintiff Gomez reported his concerns to his supervisor Angel Lopez (hereinafter "Lopez") weekly. Lopez consistently dismissed Plaintiff Gomez's concerns and demanded that he return to the chicken processing line.

85.     Additionally, Lopez reprimanded Plaintiff Gomez for stopping the processing line, which was necessary for Gomez to manually slaughter each chicken.

86.     Months later in July 2021, after Lopez made no efforts to fix the machine, Plaintiff Gomez began taking pictures of the unsafe working conditions and the number of birds he was required to slaughter manually. The machine malfunctions continued for several months, during which time Plaintiff Gomez continued to document the malfunctions.

87.     On January 13, 2022, Plaintiff Gomez took video footage of the unsafe working conditions and the hundreds of chickens he was required to manually slaughter to show to the Human Resources office (hereinafter "HR").

88.     Later that same day, Lopez scolded Plaintiff Gomez for not slaughtering the chickens fast enough. Plaintiff Gomez explained that he had to move slowly to ensure the chickens were properly slaughtered. A manager also complained to Gomez thereafter regarding the delay in the chicken processing line.

89.     Once Plaintiff Gomez was on his lunch break, Gomez's supervisor instructed Plaintiff Gomez to remove his smock and go to HR.

90.     HR informed Gomez that he would be disciplined for not following Lopez's orders to stop halting the chicken processing line. In response, Plaintiff Gomez showed HR the video he had taken earlier that morning, which evidenced the machine's malfunctioning, which necessitated the manual killing of an excessive number of chickens, resulting in unsafe working conditions and OSHA violations.

91.     Rather than addressing Plaintiff Gomez's concerns, including the ongoing OSHA violations, HR told Gomez to return to the line and to do his job. While HR instructed Gomez it would be okay for him to stop the line to slaughter the birds manually, HR expressed no concern about the unsafe working conditions or the OSHA violations and provided no guidance on whether Defendants intended to repair the malfunctioning machine.

92.     Later that day HR asked Plaintiff Gomez to return to the HR office. Upon returning to the HR office, Plaintiff Gomez was confronted by Pedro Garcia, the superintendent of Mountaire, about the video he took of the unsafe working conditions and OSHA violations.

93.     Garcia asked Gomez why he took the video and insisted Plaintiff Gomez destroy it. During this confrontation, Mountaire's security was present for the meeting, with a policeman standing by the door. Plaintiff Gomez felt very intimidated by not only the aggressive and hostile tone of Garcia but also by the inescapable presence of a security officer/policeman.

94.     As soon as Plaintiff Gomez saw a policeman standing by the door, Plaintiff Gomez sent a copy of the video to two of his friends, then proceeded to destroy the video. Once HR realized Plaintiff Gomez had forwarded the evidence to third parties, HR contacted IT to unveil to whom Plaintiff Gomez had sent the video.

95.     For the duration of this four-hour meeting, an IT person, two people from HR, an interpreter, a security/police officer, Garcia, Lopez, and the plant manager were present. At one point, Plaintiff Gomez, who is primarily Spanish-speaking, was questioned by a Spanish-speaking interpreter, as well.

96.     For two of the four hours that Plaintiff Gomez was in this meeting, he was isolated and held in a separate room by himself, where he did not feel he could leave voluntarily. While Defendants held Plaintiff Gomez, Defendants' IT department was in possession of Plaintiff Gomez's phone. Plaintiff Gomez did not feel as though he could leave voluntarily during this meeting.

97.     IT ultimately destroyed the video from Plaintiff Gomez's phone, without Plaintiff's permission.

98.     After IT confirmed it had successfully destroyed the video evidence of the unsafe work environment and OSHA violations, Garcia then took Plaintiff Gomez's employee ID and told Plaintiff that they would need to talk the following day. Garcia escorted Plaintiff Gomez to the locker room to get his things and then led Gomez to the exit.

99.     The following day, on January 14, 2022, Plaintiff Gomez was terminated over the phone by Garcia and HR. He was told Defendants "no longer had work for [him]."

100.    On July 12, 2022, Named Plaintiff Gomez filed an individual complaint with the North Carolina Department of Labor ("NCDOL"), charging Defendants with unlawful retaliation under REDA. Said complaint was filed within 180 days of the last retaliatory act by Defendant.

101.    On October 12, 2022, NCDOL issued Named Plaintiff Gomez a right to sue letter, attached, hereto as Exhibit A.

102.    Named Plaintiff Gomez instituted a private lawsuit and filed the same within ninety (90) days of receipt of the NCDOL's right to sue letter.

## FLSA COLLECTIVE ACTION ALLEGATIONS

103.    Named Plaintiffs bring the First Count of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and all similarly situated employees.

104.    Members of the FLSA class are similarly situated.

105.    Members of the FLSA class have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed and fail to compensate them at the appropriate overtime rate for all hours worked in excess of forty (40) per week.

106.    There are numerous (in excess of 1000) similarly situated current and former chicken processing line employees that fall within the scope of the aforementioned FLSA class.

107.    These similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

108.    Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

109.    Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiffs.

110.    Named Plaintiffs consent in writing to assert their claims for unpaid wages under

the FLSA pursuant to 29 U.S.C. § 216(b). Named Plaintiffs' signed consent forms are filed with the Court as Exhibit B and Exhibit C to this Complaint. As this case proceeds, other individuals will likely file consent forms and join as opt-in plaintiffs.

111. Named Plaintiffs request that they be permitted to serve as representatives of those who consent to participate in this action, and hat this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## NCWHA CLASS ACTION ALLEGATIONS

112. Named Plaintiffs bring the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated employees, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq*.

113. Numerosity: The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiffs at this time, upon information and belief, the class comprises more than 1000 individuals.

114. Common Questions Predominate: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

> a. Whether the time spent donning, and doffing personal protective equipment, sanitizing, or waiting to sanitize, constitutes hours worked;

b.  Whether post-shift work performed by putative Class Members is compensable under the NCWHA;

c.  Whether Plaintiffs were subject to an automatic deduction of thirty-six minutes from their hours worked;

d.  Whether work performed by Plaintiffs during auto-deducted thirty-six minute meal breaks is compensable under the NCWHA;

e.  Whether Defendants' failure to compensate putative Class Members for all hours worked due to Defendants' policy and practice of automatically deducting lunch breaks is in violation of the NCWHA;

f.  Whether Defendants failed to compensate putative Class Members at the earned, accrued, and/or promised rate for all hours worked, including for hours in excess of forty (40), each week pursuant to § 95-25.6; and

g.  Whether Defendants failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NCWHA.

h.  Whether Defendants provided any advance written notice of their intent to make a wage deduction for chicken sales and plant supplies in the manner required by NCWHA; and

i.  Whether Defendants provided Plaintiffs and the class of persons they seek to represent with any form of written notice of their intent to make a wage deduction for chicken sales or plant supplies, and whether such notice complied with the requirements of the NCWHA.

115.  Typicality: The claims of Plaintiff are typical of the claims that could be alleged by

any member of the putative Class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all pre-shift, meal "break," and post-shift work, for hours worked in excess of forty (40) each week at the appropriate hourly rate, and for all hours worked at the appropriate hourly rate. Defendants' compensation policies and practices affected all putative class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each putative class member. The claims of the Named Plaintiffs who seek to represent the class defined above are typical of the claims of the class of persons in that Defendants made at least one or more weekly wage deductions from the wages due without any advance written notice of the intent to make such a wage deduction in compliance with the NCWHA. Plaintiff and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

116.    Adequacy of Representation: Named Plaintiffs are able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Plaintiff Gomez and members of the proposed class. Named Plaintiffs have retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

117.    Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses,

injuries, and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action.  Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties.  The issue in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

118.    Public Policy Considerations: Defendants violated the NCWHA.  Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment.  Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

119.    Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## COUNT ONE
### Violation of the Fair Labor Standards Act
### 29 U.S.C. § 207
### Brought by Named Plaintiffs on Behalf of Themselves and All Similarly Situated Employees

120.    Named Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

121.    At all relevant times, Defendants have been and continue to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

122.    At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Named Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

123.    At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

124.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendants, to compensate all non-exempt employees at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

125.    At all relevant times, Defendants, pursuant to their policies and practices, willfully failed and refused to pay for all hours worked to Plaintiffs, including for required doffing and redonning of personal protective equipment, and post-shift work performed by Plaintiffs.

126.    Defendants have willfully failed to pay Plaintiffs as required by the FLSA by engaging in a pattern or practice of permitting or requiring Plaintiffs to perform activities integral

26

Case 7:23-cv-00004-M-RJ   Document 1   Filed 01/10/23   Page 26 of 35

and indispensable to their principal activities, during unpaid breaks and after regular paid work time, without compensation at the applicable minimum wage and overtime rate for all hours worked, including over forty (40) per week.

127.     The foregoing conduct, as alleged above, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a), particularly in light of Defendants' history of being sued for the same and/or similar wage and hour violations.

128.     As a result of Defendants' unlawful acts, Plaintiffs have been deprived of compensation for all required hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees, and costs, pursuant to 29 U.S.C. § 216(b).

129.     Plaintiffs and Putative Plaintiffs each worked more than forty (40) hours in one or more workweeks within the applicable statutory period.

**<u>COUNT TWO</u>**
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.6**
**Brought by Named Plaintiffs on Behalf of Themselves and All Similarly Situated**
**Employees**

130.     Named Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

131.     The class period for this cause of action is at least two years from the date of the filing of the initial Complaint. *See* Dkt. 1.

132.     At all relevant times, Defendants have employed, and/or continue to employ,

Named and Putative Plaintiffs within the meaning of the NCWHA.

133.    Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

134.    Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment, as well as to make available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2).

135.    Acceptable measures of providing employees information about promised wages include "an up-to-date employee handbook or other written statements of policies and practices with regard to promised wages" or through "payroll records, including check stubs, for wages promised in the form of hourly pay or salary or other forms whose terms are readily identifiable from payroll records," and employers are required to pay such promised wages. Notification of Employment, 13 N.C.A.C. 12.0805 (2022).

136.    Additionally, "[a]n employee's signature on an employer's written notice of the promised wages which bears the date on which the employee was provided with the notice shall be presumptive evidence of the employer's notification in accordance with G.S. 95-25.13(1)." Notification at Time of Hiring, 13 N.C.A.C. 12.0804 (2022).

137.    Invariably, ***"[o]nce a promise is made by an employer, that employer must pay all promised wages, including wage benefits, accruing to its employees based on any policy, agreement or practice that the employer has established***." *See* North Carolina Department of Labor, *Promised Wages Including Wage Benefits*, https://www.labor.nc.gov/workplace-rights/employee-rights-regarding-time-worked-and-wages-earned/promised-wages-including.

138.    Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendants were required to pay Plaintiffs and putative class members all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

139.    Every employer shall maintain complete and accurate records that document, in relevant part, the hours worked each workweek and all other records required to compute wages. 13 NCAC 12.0801.

140.    Additionally, Defendants were required to provide employees with advanced notice for wage deductions permissible by and in compliance with the NCWHA.

141.    Defendants intentionally refused to pay all wages due, including wages for all hours worked, as accurately recorded by Plaintiffs, and as set forth in the preceding paragraphs of this Complaint, to Plaintiffs and putative class members in violation of the NCWHA.

142.    Defendants are not permitted by state or federal law to withhold or divert any portion of Plaintiffs' and class members' wages that are at issue in this Complaint.

143.    Defendants were aware that Plaintiffs and putative plaintiffs were not receiving all promised straight-time wages for all hours worked up to forty (40) and promised premium wages for hours worked in excess of forty (40) per week pursuant to the promised straight-time rate and corresponding promised premium rates.

144.    The alleged foregoing conduct constitutes willful violations of the NCWHA, N.C. Gen. Stat. §95-25.1, *et seq*.

145.    The nature of Defendants' work required Plaintiffs to wear protective equipment

and gear that needed to be removed and sanitized. As required by Defendants' policies, Plaintiffs were required to redon personal protective equipment before returning to work after meal breaks, and Plaintiffs were also required to clock out before removing and sanitizing their protective equipment and gear.

146. Defendants employed Named and Putative Plaintiffs within the State of North Carolina.

147. At all relevant times, Defendants, pursuant to its policies and practices, failed and refused to pay Plaintiffs all owed, earned, and promised wages, including for all work-related activities performed from the moment they clock in through the moment they clocked out, including, for example, required post-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiffs are lawfully entitled to for hours worked in excess of forty (40) in a single workweek.

148. Consistent with the above, Defendants' failure to pay Plaintiffs all owed, earned, and promised wages violates N.C. Gen. Stat. § 95-25.6.

149. As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

150. Defendants' failure to pay Plaintiffs all owed, earned, and promised wages, given that, upon information and belief, Defendants knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

151. As a result of Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-

25.6, 95-25.22(a), (a1), and (d).

## **COUNT THREE**
**Violation of the North Carolina Retaliatory Employment Discrimination Act 29 N.C. Gen. Stat. § 95-240**
**Brought by Named Plaintiff Gomez on Behalf of Himself**

152.    Named Plaintiff Gomez incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

153.    Each Defendant is a person within the meaning of N.C. Gen. Stat. § 95-240 (1).

154.    Defendants are an "employer" within the meaning of N.C. Gen. Stat. § 95-240.

155.    Filing a claim or complaint, initiating any inquiry, investigation, inspection, proceeding, or other action, or testifying or providing information to any person with respect to the General Statutes is a protected activity under N.C. Gen. Stat. § 95-243.

156.    North Carolina law prohibits discrimination or retaliation against an employee for exercising rights protected under the North Carolina General Statutes. N.C. Gen. Stat. § 95-241(a). This includes making any discrimination or retaliation against an employee for reporting a violation of the North Carolina Occupational Safety and Hazard Act unlawful.  N.C. Gen. Stat. § 95-241(a)(1).

157.    The North Carolina Occupational Safety Hazard Act ("NC OSHA") adopts all occupational safety and health standards promulgated under the federal act. N.C. Gen. Stat. § 95-131.

158.    Employers are required to provide each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 C.F.R. 654(a)(1); *see also* OSHA, *COVID-19 Standards*, https://www.osha.gov/SLTC/covid-19/standards.html *(*citing 29 C.F.R. 1910 Subpart 1, generally requiring gloves, eye and face protection, and respiratory protection when job hazards warrant).

159. Plaintiff Gomez made clear his intent to initiate an investigation into Defendants' violative practices. Plaintiff Gomez communicated such complaints to Defendants, including not only through his direct supervisor but also Defendants' human resources personnel and corporate officials. Plaintiff Gomez clearly identified his concerns related to Defendants' unsafe and violative work environment, including addressing Defendants' failure to adequately repair machinery and to provide safe working conditions and even showing Defendants evidence of the violations through video footage. Plaintiff Gomez made clear the intent to initiate an investigation into Defendants' violative practices and thereby engaged in protected activity. N.C. Gen Stat. § 95-241(a).

160. Plaintiff Gomez's actions unambiguously sought to initiate an investigation into OSHA violations with complaints; efforts Defendants not only ignored by actively coordinated efforts to cover up any such investigation and evidence obtained by Plaintiff to support his complaints.

161. Plaintiff Gomez complained to management about the machines each week. Plaintiff Gomez also informed HR of the unsafe working conditions and OSHA violations, as well as the Superintendent of Mountaire.

162. Immediately after Plaintiff Gomez complained about an unsafe working environment and provided evidence of the same to Defendants, Defendants held Plaintiff Gomez in a room for hours against his will, using force of intimidation through the presence of security personnel and police officers, and ultimately, Defendants terminated Plaintiff Gomez the very next day.

163. Defendants' hostile treatment towards Plaintiff Gomez after reporting his complaints, including Defendants' termination of Plaintiff Gomez's, employment was in violation

of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240 *et seq*.

164. Accordingly, Plaintiff Gomez is entitled to lost wages, lost benefits, and other economic losses as well as treble damages pursuant to N.C. Gen. Stat. § 95-243.

**COUNT FOUR**
**Wrongful Discharge in Violation of North Carolina Public Policy**
**North Carolina Common Law**
**Brought by Named Plaintiff on Behalf of Himself and Opt-in Plaintiffs**

165. Named Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

166. It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. § 95-240, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, that employees be free from harassment, discrimination, and retaliatory treatment in their employment.

167. Named Plaintiff participated in a legally protected activity by pursuing lawful employment with the expectation of having their constitutional and statutory rights respected and preserved by Defendant.

168. The termination of Plaintiff Gomez's employment, resulting from complaining about workplace safety violations and providing evidence of the same, was wrongful as against the public policy of the State of North Carolina.

169. Such termination proximately caused Named Plaintiff to suffer emotional distress and other losses, as described above. Accordingly, Plaintiff Gomez is entitled to compensatory damages under North Carolina law and interest pursuant to N.C. Gen. Stat. § 24-5(b).

170. Defendants' acts constituted willful, wanton, and malicious conduct, entitling Plaintiff Gomez to punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiff, on behalf of himself and all those similarly situated, prays that this Honorable Court:

1.      Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiffs as representatives of all those similarly situated under the FLSA collective action;

2.      Issue an Order certifying this action as a class action under the NCWHA, and designate Named Plaintiffs as representatives on behalf of all those similarly situated under the NCWHA class;

3.      Award Named Plaintiffs and all those similarly situated actual damages for all unpaid wages found due, and liquidated damages equal in amount, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a1);

4.      Award Named Plaintiffs and all those similarly situated pre- and post-judgment interest at the statutory rate, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a);

5.      Award Named Plaintiffs and all those similarly situated attorney's fees, costs, and disbursements as provided by FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(d); and

6.      Award Named Plaintiff Gomez all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, and monetary losses sustained, as a result of Defendants' unlawful actions under REDA and for violations of North Carolina Public Policy;

7.      Award Named Plaintiffs and all those similarly situated interest at the prevailing rate, as provided under 29 U.S.C. § 2617(a)(1)(A)(ii) and N.C. Gen. Stat. § 95-243(c);

8.     Award Named Plaintiffs and all those similarly situated all consequential damages due as a result of Defendants' unlawful acts;

9.     Award Named Plaintiffs and all those similarly situated punitive damages for Defendants' willful, wanton, and malicious conduct;

10.    Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this January 10, 2023.

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Phone: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiffs*